**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| JANE DOE,<br><br>      Plaintiff,<br><br>      v.<br><br>SAMAH BADAWI and MOHAMMED<br>MANAR EL-IRIQSOUSI,<br><br>      Defendants. | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff JANE DOE ("Ms. Doe" or "Plaintiff"), by and through her undersigned counsel,

files this Complaint against SAMAH SARB BADAWI ("Badawi") and MOHAMMED MANAR

EL-IRIQSOUSI ("El-Iriqsousi"), collectively "Defendants," and alleges as follows:

## THE PARTIES

1.      Plaintiff Jane Doe is an Indonesian citizen and adult resident of the District of

Columbia.  At all times relevant to the Complaint, Plaintiff worked for Defendants as a domestic

worker on a G-5 visa.  While employed by Defendants, Plaintiff lived and worked at their

residence at 720 Huntsman Place, Herndon, Virginia, 20170.

2.      Upon information and belief, Defendants Samah Sarb Badawi and Mohammed

Manar El-Iriqsousi are Saudi Arabian citizens married to each other, and employed at the World

Bank in Washington, D.C.  Defendants reside at 720 Huntsman Place, Herndon, Virginia, 20170.

At all times relevant to the Complaint, Defendants employed Plaintiff as a domestic worker at

their place of residence in Herndon, Virginia.

## JURISDICTION AND VENUE

3.      The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 (federal question) because the action arises under the Trafficking Victims Protection Act

("TVPA"), 18 U.S.C. § 1589 et seq., and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.  The Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

4.      This Court has personal jurisdiction over the Defendants as they are domiciled in Herndon, VA, and employed Plaintiff in Herndon, VA, during the period that gives rise to Plaintiff's causes of action.

5.      Venue is proper in this district under 28 U.S.C. § 1391(b)(3) because the events giving rise to Plaintiff's claims primarily happened in Herndon, VA.

## ALLEGATIONS OF FACT

### *Recruitment of Plaintiff*

6.      In or about December 2020, Plaintiff, who at the time was living in Indonesia, was recruited by Badawi, through GreatAupair.com, to work as a domestic worker at Badawi's place of residence in Herndon, VA.

7.      Badawi described the position to Plaintiff as a housekeeper and nanny providing childcare for two of her children.

8.      Badawi employed the help of Defendants' then-current nanny and housekeeper (hereinafter "Prior Nanny") to speak with Plaintiff about the domestic worker position in an effort to recruit Plaintiff.

9.      Prior Nanny told Plaintiff that she was also from Indonesia, and that Badawi preferred Indonesian housekeepers because Badawi had had an Indonesian housekeeper as a child growing up in Saudi Arabia.  After speaking with Badawi and Prior Nanny, Plaintiff trusted Badawi and agreed to the position.

10.      The Defendants recruited Prior Nanny and Plaintiff to come to the United States under an employer-sponsored visa program for domestic workers.  These visas, known as G-5

visas, allow foreign officials of international organizations such as the World Bank to bring domestic workers into the country to work in their households.

11.     Due to abuse of domestic workers on G-5 visas, the Department of State has adopted strict rules governing the treatment of these workers.  Congress has also mandated protections for domestic workers in the United States on G-5 visas.

12.     As part of the oversight of the G-5 visa program, the Department of State's Office of Protocol conducts periodic check-ins with the domestic workers to ensure that employers are complying with the terms of the G-5 employment contract and with U.S. Department of State policies.  Under these rules, employers must provide G-5 domestic workers with at least one full day off a week, must pay wages in accordance the federal, state or local minimum wage, must pay the employee through a bank account within 30 days of arrival, must provide the employee with a pay stub documenting hourly wages, overtime wages, and the number of hours within the pay period.  The Department of State also requires that employers allow the domestic worker to leave the residence outside of work hours and pay for the cost of the worker's travel at the conclusion of employment.  Domestic workers must be permitted to retain possession of their passports.

13.     World Bank officials (such as Defendants) are required to comply with all such State Department policies regardless of their nationality or position within the institution.  In addition, the World Bank requires all employees (such as Defendants) to provide their domestic worker employees with health insurance, engage a payroll provider, and obtain a Social Security number for the domestic worker.  *See* https://www.worldbank.org/en/about/unit/human-resources/request-g5-visa-for-a-prospective-domestic-employee-residing-outside-the-

us#:~:text=The%20prospective%20G%2D5%20employee,of%20the%20staff%20members%27
%20spouse.

14.     On or about March 22, 2022, Badawi and Plaintiff executed the G-5 Employment

Agreement (the "Employment Agreement").  Badawi had sent the Employment Agreement to

Plaintiff in December 2021.

15.     Among other things, the Employment Agreement provided for the following:

   a.  An employment start date of March 22, 2022;

   b.  A work location of 2267 Wheelwright Ct., Reston, VA 20191;

   c.  Plaintiff's work hours, roughly equating to 35 hours per week, Monday
       through Friday;

   d.  Compensation terms, under which Defendants would pay Plaintiff $11 per
       hour, such that Plaintiff would receive a payment of $770 every other
       Friday for work performed;

   e.  An overtime rate of $14.25 per hour for all hours considered overtime
       under federal, state, or local law;

   f.  Leave benefits, including seven days of sick leave, 14 days of paid
       vacation, and two paid holidays for the calendar year;

   g.  A requirement that Plaintiff open a U.S. bank account and that all
       payments to Plaintiff after the first 30 days be deposited into her bank
       account and accompanied by a receipt and pay slip;

   h.  A prohibition on Defendants having access to Plaintiff's bank account;

   i.  Job duties showing that Plaintiff would perform the duties of (i) childcare,
       (ii) housework, and (iii) cooking;

j.  A strict prohibition on intimidation, abuse, or harassment of Plaintiff;

k.  A requirement that Plaintiff reside at Defendants' home;

l.  A prohibition on withholding pay for meals, lodging, medical care, medical insurance, uniforms, recruitment fees, or costs of travel related to employment;

m.  A requirement that Defendants maintain an employment file for at least three years after Plaintiff's termination containing, at a minimum: (i) Plaintiff's full name and Social Security number; (ii) Plaintiff's home address; (iii) hours worked each work day and total hours worked each work week; (iv) total wages paid each week to Plaintiff including overtime payments; and (v) copies of all employment contracts; and

n.  A requirement that Defendants comply with all federal, state, and local laws at all times.

***The True Terms of Plaintiff's Employment with Defendants***

16.    On or about April 17, 2022, Plaintiff arrived in the United States for the first time and started her employment with Defendants.

17.    As time passed, Plaintiff realized that the true terms of the position she accepted did not match what was in the Employment Agreement she had signed and what she had been led to believe by the Defendants.

18.    For example, Plaintiff's workplace was at Defendants' residence 720 Huntsman Place, Herndon, Virginia.  This address was different than the workplace address listed in the Employment Agreement, and, to Plaintiff's knowledge, the Employment Agreement was not updated to make the Department of State aware of her workplace.

*Wages*

19.     In early May 2022, after Plaintiff had arrived in the United States, Badawi informed Plaintiff that Defendants would only pay Plaintiff $700 per month for her services, despite the signed contract promising more than twice that amount.  Plaintiff protested and asked Badawi why.  Badawi refused to speak further about it and told Plaintiff to ask Prior Nanny about it.

20.     Plaintiff contacted Prior Nanny, who stated that she had been paid very little by the Defendants.  Prior Nanny also told Plaintiff that Defendants told her that she could not leave their employ until she helped them find a new nanny.

21.     Defendants informed Plaintiff that she would only be paid $700 per month, in violation of the Employment Agreement and the Department of State's policies.

22.     In or about May 2022, Plaintiff told Defendants that she wanted to return to Indonesia because the pay was not what they agreed to.  Defendants refused to let her leave until she helped to find a replacement nanny.  Defendants also told Plaintiff that they had just spent money for her to travel the U.S. and that she must work off that cost before she could leave.  Plaintiff had no money to flee or to purchase a ticket to return home.  Over the next several months, Plaintiff continued to ask Defendants to allow her to leave.  In or about November 2022, Defendants told Plaintiff that they would only let her leave if she convinced Prior Nanny (Defendants' previous nanny) to return to work for Defendants, or if she helped them to recruit another nanny from Indonesia.

23.     During the length of Plaintiff's employment, Defendants did not even pay Plaintiff $700 per month on a regular basis.

24.    In or about May 2022, after Plaintiff had been working for about a month, Badawi refused to pay Plaintiff even the $700 directly. Instead, Badawi insisted that she send that money to Plaintiff's family in Indonesia, since Plaintiff did not yet have a U.S. bank account. This was despite the fact that Badawi was required to set up a U.S. bank account for Plaintiff so that the Department of State could monitor that Plaintiff was being paid according to minimum wage laws. On information and belief, Badawi sent Plaintiff's illegally low wages ($700 per month) for the first three months of Plaintiff's employment to Plaintiff's aunt in Indonesia.

25.    Following those first three months and before Plaintiff was allowed to open a U.S. bank account, Plaintiff asked Badawi to stop sending her wages to Indonesia. Badawi again refused to pay Plaintiff these wages directly and instead told Plaintiff she would hold onto Plaintiff's earned wages for her and pay Plaintiff once Plaintiff had a U.S. bank account.

26.    Between April 17, 2022 and November 2022, while Badawi claimed to be "holding" on to Plaintiff's pay for her, Defendants did not provide Plaintiff with any pay stubs reflecting her pay during this time.

27.    During that period, Plaintiff was never paid directly, save for a few hundred dollars in cash. Plaintiff had no access to the wages she earned under the Employment Agreement. She had no way of knowing whether she was really being paid other than the Defendants' claims that they were "holding" on to her pay for her. Defendants failed to obtain a Social Security number for her.

28.    In November 2022, Badawi finally took Plaintiff to open a bank account at Bank of America in Plaintiff's name. Upon returning from opening the account, Badawi confiscated Plaintiff's account paperwork and demanded the PIN number. Plaintiff, fearful of retribution, complied. Defendants told Plaintiff she would only be given access to her bank account prior to

her mandated check-ins with the Department of State.  Plaintiff's wages were not deposited into this account until Defendants made deposits of $700 starting on January 29, 2023, and then made Plaintiff deposit back dated checks around February 28, 2023 in advance of her March 2023 check-in with the Protocol Office.  Plaintiff believes that Defendants made these deposits to commit fraud and evade detection of their wage theft by the Protocol Office because Defendants instructed Plaintiff that the money in the bank account was <u>not</u> her money, and she was not to touch it.

29.    From or about April 2022 to March 2023, Plaintiff was not paid a regular wage by the Defendants, not even the $700 a month that had allegedly been sent to her aunt.

<em>Duties</em>

30.    Defendants never followed the terms of the Employment Agreement or complied with the Department of State's requirements regarding Plaintiff's hours of work.  Instead, they required Plaintiff to work approximately fourteen hours every day, from 7 AM to 9 PM, often times seven days a week.

31.    During the majority of the period at issue, Defendants required Plaintiff to work on Saturdays and Sundays in violation of the Employment Agreement.

32.    Plaintiff's daily duties started with preparing Defendants' oldest child for school. During the day, Plaintiff was required to care for Defendants' youngest child who was not yet in school.  While providing childcare, Plaintiff was required to clean the living room, bathrooms, bedrooms, and do the laundry.

33.    Defendants generally did not provide Plaintiff, who is Muslim, the time to pray during the day as her faith requires.  Even when Plaintiff was allowed to pray after repeatedly asking for this time, Defendants would sometimes instruct her to "make it quick."  On many

occasions, Defendants did not permit Plaintiff any time to pray, and Plaintiff would have to miss required prayers.

34.     Defendants required Plaintiff to clean the house with strong chemical cleaning products every day, but refused to provide Plaintiff with rubber gloves.  As a result, Plaintiff suffered injuries to her hands.  Plaintiff's hands became dry and cracked.  Plaintiff also sustained many cuts and bruises from the work Defendants required her to do that would sting when using the chemicals.

35.     On one occasion, Plaintiff was in so much pain that she was unable to move. After pleading for help from Defendants, Badawi reluctantly took Plaintiff to the hospital. However, Badawi fraudulently checked Plaintiff in for care under Prior Nanny's name and insurance information.  Badawi forbade Plaintiff from saying anything to the hospital staff, and Badawi lied to the nurses that Plaintiff could not speak English.  Plaintiff does not know if the Defendants ever purchased health insurance for her, as required under the World Bank regulations.

36.     The doctors diagnosed Plaintiff with severe back muscle spasms caused by over-exertion and prescribed medicine to Plaintiff.  The doctors stated that Plaintiff was to rest and was not to bend over or lift heavy things for some time.  However, Badawi forced Plaintiff to resume all her duties as soon as the medicine started to reduce the pain in Plaintiff's back.

37.     In the evenings, Plaintiff was required to prepare dinner for the family and any guests.  Plaintiff was not allowed to eat dinner until the family and/or all guests had finished eating.

38.     For lunch, Plaintiff was only permitted to eat the family's leftovers from the day before.  On one occasion, Badawi accused Plaintiff of stealing the family's bread for her own

meals.  This intimidation resulted in Plaintiff eating very little and losing weight while working for Defendants.

39.     Even though the Employment Agreement stipulated that Plaintiff was hired to perform childcare, housework, and cleaning, Defendants demanded Plaintiff serve them in other ways.  During the two days per week when Defendants worked from home, Defendants required Plaintiff to prepare and bring Defendants coffee whenever they requested.

40.     Defendants smoked hookah most nights in the gazebo outside the home. Defendants required Plaintiff to clean the hookah to ensure it was clean and prepared for the next evening.

41.     Defendants required Plaintiff to accompany them on errands or trips so she could watch the children.  Plaintiff was prohibited from taking time off even during those times when Defendants were with their own children.  When the family would return from errands, Plaintiff was required to unload items from Defendants' cars and put the children to bed.

42.     Plaintiff was also required to clean Defendants' cars and, during the fall season, to clean the yard.

43.     On weekends, Defendants refused to allow Plaintiff to leave the residence, unless she obtained their express permission.  Defendants routinely told Plaintiff that it was unsafe to walk outside, as there were dangerous people about, and Plaintiff was unable to drive.  Plaintiff did not have any days off between April and mid-December 2022.

***Defendants Controlled Plaintiff Through Threats and Intimidation***

44.     Defendants intimidated Plaintiff on a regular basis to hold her in forced labor and prevent her from departing their employ.

*A Hostile Environment at the Residence*

45.    In the summer of 2022, Plaintiff was helping Badawi in the kitchen while El-Iriqsousi watched the children outside.  El-Iriqsousi yelled for Plaintiff, who heard him and rushed to him.  El-Iriqsousi had lost sight of the children while doing other tasks and blamed Plaintiff for not watching the children.  He threatened Plaintiff that he would sue her if she failed to watch the children and if anything happened to them.  Plaintiff was terrified of the financial, professional, and other consequences if she were sued by Defendants.  Because of this threat, amongst others, Plaintiff was in constant fear of punishment as she cared for the children.

46.    Defendants referred to Plaintiff in demeaning terms, calling her "stupid" and "lazy" on a regular basis.

47.    On at least one occasion, El-Iriqsousi reached out and grabbed Plaintiff's arm, in violation of well-established Muslim principles that a man should not touch a woman unrelated to him.

48.    Defendants preyed upon Plaintiff's lack of familiarity with U.S. laws and customs, and her isolation from anyone outside of their home.

49.    Defendants threatened Plaintiff by telling her they knew where her family lived in Indonesia.

50.    Defendants kept cameras in the residence and told Plaintiff that the Defendants were watching her at all times.

51.    Defendants repeatedly threatened Plaintiff by telling her that Americans did not like Muslims and that if she went out in public she could be shot and mistaken for a terrorist.

11

52. Defendants repeatedly threatened Plaintiff that she would be deported if she told anyone about the Employment Agreement violations and the real terms and conditions of her employment.

53. Due to the Defendants' threats, Plaintiff feared that she and her family would suffer harm if she did not continue working for Defendants. Plaintiff felt she had no alternative to remaining in forced labor in the Defendants' home.

54. On the rare occasions when Plaintiff had any contact with other people, Defendants would interrogate her about any communications she had with them. Defendants demanded to know what Plaintiff told these individuals about Defendants, about her employment with Defendants, and whether Plaintiff had shown the Employment Agreement to these individuals.

### *The First Two Department of State Check-Ins*

55. In or around July 2022, Plaintiff attended her first mandatory "check-in" with officials from the Department of State's Office of Protocol. The purpose of this check-in was to ensure the terms and conditions of the Employment Agreement and G-5 requirements were being followed. Domestic workers who completed the check-in received a domestic worker identification card.

56. In preparation for this meeting, Defendants told Plaintiff to lie about the conditions of her employment. Defendants instructed her to say only nice things about Defendants to the Department of State officials, and threatened that if she did not, Plaintiff would be deported.

57.    Defendants told Plaintiff that Americans, and especially the American government, hate Muslims and would use Plaintiff's religion and the fact that Plaintiff wears a headscarf as an excuse to deport her to Indonesia.

58.    Because of Defendants' threats, when Plaintiff met with the Department of State officials, Plaintiff was terrified that she would be deported if she told the truth about the Defendants' violations of her contract.  She feared reporting the truth about her working conditions and Defendants' refusal to pay her wages according to the Employment Agreement or U.S. law.

59.    At the check-in meeting, Plaintiff truthfully told the Department of State officials that she did not have a Social Security number or a bank account.  The State Department official informed her that her employers (the Defendants) would have to help her to obtain a Social Security number and a bank account before she could receive a domestic worker identification card.  The official asked Plaintiff about how she was receiving her wages.  Plaintiff responded that her wages were being sent to her family in Indonesia.  The official told her that was improper and that she should receive her wages here in the U.S., and that her employers should help her get a Social Security number and then open a bank account in the U.S. for her earnings. The official asked Plaintiff about her work schedule.  Plaintiff, terrified of Defendants' threats of deportation, told the official that her schedule generally followed the terms of the Employment Agreement and that she had Sundays off.

60.    When Plaintiff returned to the residence, she informed Defendants that she did not receive the domestic worker identification card from the Protocol Office and would have to return again.  She also informed them that the Protocol Office's official had said that she needed

to obtain a Social Security number and a U.S. bank account, and that wages were not to be sent home to her family in Indonesia.

61.     Upon hearing this, Defendants became upset and interrogated Plaintiff. Defendants asked about what was said during the check-in and told Plaintiff she should have told the official that she got both Saturdays and Sundays off.  Plaintiff reiterated that the main issue was the lack of a Social Security number and a U.S. bank account.  The next day, Badawi helped Plaintiff complete the paperwork for a Social Security number.

62.     In or around January 2023, El-Iriqsousi took Plaintiff for a visit to the Department of State Office of Protocol.

63.     Defendants again "prepped" Plaintiff for this check-in and threatened Plaintiff that if Plaintiff did not answer the official's questions in the manner that Defendants directed, then Plaintiff would be deported.  Defendants instructed Plaintiff to lie to the officials and tell them that her conditions of employment aligned with the Employment Agreement and that she did not have her Social Security card yet, but that she was working on getting it, and that she needed more time to set up a bank account.

64.     When Plaintiff met with the Protocol Office's official again, she told them that she still did not have her Social Security number or a U.S. bank account.  As a result, the official withheld the domestic worker identification card again.  The official asked how Plaintiff was getting paid if she did not have a U.S. bank account.  Plaintiff told the official that Defendants were holding onto her wages for her until a bank account was opened.  The official told Plaintiff that such an arrangement was not permitted, and that the Department of State would email Defendants to ask about Plaintiff's wages.  Plaintiff left the meeting terrified of how Defendants would react.

14

65.    Defendants were upset that Plaintiff did not receive her domestic worker identification card.

### *Contact with Individuals Outside the Defendants' Residence*

66.    In or about December 2022, and for the first time since arriving in the U.S. in April, Defendants permitted Plaintiff time off to attend a social event.  Plaintiff went to a social event at the Indonesian Embassy in Washington, D.C.  At this event, Plaintiff met several other individuals from Indonesia.

67.    When Plaintiff returned to the residence, Defendants interrogated Plaintiff about what she said to other individuals about Defendants and Plaintiff's working conditions. Defendants interrogated Plaintiff whether she showed her Employment Agreement to anyone. Plaintiff answered that she had not.

68.    Later in December 2022, Plaintiff asked Defendants for their permission to go on a short trip over the Christmas holiday period to Boston, Massachusetts, with individuals from the Indonesian Embassy for a conference.  Defendants denied her request at first.  Plaintiff pleaded that she would only go during the time the Defendants were also off work for the winter holidays and they eventually, reluctantly agreed.

### *Plaintiff's Escape from Defendants' Residence*

69.    During this trip to Boston, Plaintiff for the first time spoke about her working conditions and her employment with outsiders.  These individuals were concerned for Plaintiff and told Plaintiff that she should ask the Department of State Office of Protocol for help.

70.    In or around February 2023, and upon Plaintiff's request, the Department of State Office of Protocol asked to see Plaintiff for another check-in.  Plaintiff's check-in was scheduled for March 2, 2023.

71.     In preparation for this check-in, Defendants sent Plaintiff to Bank of America to deposit several back-dated checks into the Bank of America account set up in her name, in order for it to appear to the Department of State that Plaintiff had been regularly paid, even though Plaintiff had not been paid at all.

72.     Defendants also forced Plaintiff to sign a number of fake timecards that stated Plaintiff was only working eight (8) hours a day for five (5) days a week.  Defendants told Plaintiff to show these timecards to the Office of Protocol, even though they were fake and she had been forced to work far in excess of 40 hours a week.

73.     When time came for the check-in meeting, Defendants gave Plaintiff her Bank of America ATM card and told Plaintiff not to touch the money in her account that had been deposited through the back-dated bank checks because it was not her money.  Defendants told Plaintiff that they would take the ATM card and the money back as soon as the check-in meeting was over.  Defendants told Plaintiff she had to tell the Department of State official that she was working and being paid by Defendants pursuant to the terms of the Employment Agreement. Defendants told Plaintiff that if Plaintiff did not lie, Defendants' careers would be destroyed. Defendants told Plaintiff to think about the children and what would happen to them if Defendants lost their jobs.  Finally, Defendants told Plaintiff that if she did not lie, she would be deported.

74.     On March 2, 2023, Plaintiff went to the check-in meeting at the Office of Protocol with a bag packed with essential belongings.  Plaintiff told the official what had happened to her and reported the Defendants' crimes.  Plaintiff told the official that the timecards were faked, and that the money in the Bank of America account was just recently deposited, and that she did not have access to it.

16

75.    Plaintiff asked the Department of State officials if she would be deported as a result of what had happened.  The officials assured her that she would not.

76.    Plaintiff did not return to the employ of Defendants after the check-in.

77.    After the check-in, Plaintiff took refuge in the home of an individual she met during the Boston trip.  However, when Plaintiff did not return from the check-in, Defendants started harassing the people they knew Plaintiff had met during the Boston trip.  Defendants stalked the property searching for Plaintiff, and Plaintiff was forced to flee again to another location.  In fear of Defendants, Plaintiff has since lived in hiding at various safe locations.

## COUNT I

**Forced Labor in Violation of the Trafficking Victims Protection Act**
**(18 U.S.C. § 1589 et seq., 18 U.S.C. § 1595)**

78.    Plaintiff reincorporates the allegations contained in paragraphs 1 through 77 as though fully set out herein.

79.    18 U.S.C. § 1589(a) makes it unlawful to:

> [K]nowingly provide[] or obtain[] the labor or services of a person by any one of, or by any combination of, the following means--(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

80.    Defendants attempted to and did knowingly obtain Plaintiff's labor in violation of 18 U.S.C. § 1589(a) by, *inter alia*, withholding and failing to pay Plaintiff's wages; refusing to allow Plaintiff to return home or terminate her employment; making threats of deportation, threats of financial harm, threats of abuse of the legal process, and threats to Plaintiff's family; and isolating Plaintiff within their residence and from others.

17

81.    At the times material to the Complaint, Defendants Badawi and El-Iriqsousi were in a conspiracy and/or a venture with each other with respect to the allegations set forth above. Defendants conspired, and were in a venture with one another, to obtain and benefit from Plaintiff's labor in violation of 18 U.S.C. § 1589(b), brought as a civil claim under 18 U.S.C. § 1595.

82.    Plaintiff brings this claim for relief pursuant to 18 U.S.C. §§ 1589, 1589(b), and 1595.

83.    As a direct and proximate cause of Defendants' actions, Plaintiff has suffered damages in an amount to be established at trial.

84.    Defendants' conduct as alleged herein was undertaken deliberately and with actual malice, that is, with a sense of consciousness and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, or fraud.  Alternatively, Defendants' conduct involved reckless or callous indifference to the rights of Plaintiff.

85.    Plaintiff is entitled to recover damages to account for the full value of her losses, including emotional distress, lost wages, punitive damages, and other losses suffered by Plaintiff as a result of Defendants' conduct, along with reasonable attorneys' fees incurred in this action.

## COUNT II

**Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of the Trafficking and Violence Protection Act**

**(18 U.S.C. § 1590, 18 U.S.C. § 1595)**

86.    Plaintiff reincorporates the allegations contained in paragraphs 1 through 85 as though fully set out herein.

18

87.     18 U.S.C. § 1590(a) makes it unlawful to "recruit[], harbor[], transport[], provide[], or obtain[] by any means, any person for labor or services in violation of this chapter[.]"

88.     As alleged in the preceding paragraphs, Defendants knowingly harbored, transported, provided for, and obtained Plaintiff for labor in violation of numerous provisions of Chapter 77, including 18 U.S.C. §§ 1589 and 1592(a).

89.     Plaintiff brings this claim for relief pursuant to 18 U.S.C. § 1595.

90.     As a direct and proximate result of Defendants' actions, Plaintiff has suffered damages in an amount to be established at trial.

91.     Defendants conduct as alleged herein was undertaken deliberately and with actual malice, that is, with a sense of consciousness and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, or fraud.  Alternatively, Defendants' conduct involved reckless or callous indifference to the rights of Plaintiff.

92.     Plaintiff is entitled to recover damages to account for the full value of her losses, including but not limited to, emotional distress, lost wages, punitive damages and other losses suffered by Plaintiff as a result of Defendants' conduct along with reasonable attorneys' fees incurred in this action.

## COUNT III

### Failure to Pay Federal Minimum Wage and Overtime in Violation of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.

93.     Plaintiff reincorporates the allegations contained in paragraphs 1 through 92 as though fully set out herein.

94.     This count sets forth a claim for declaratory relief and damages for Defendants' violation of the minimum wage and overtime provisions of the FLSA.

95.    At all times relevant to this action:

    a.    Plaintiff was Defendants' "employee" within the meaning of 29 U.S.C. § 203(e);

    b.    Defendants were Plaintiff's "employers" within the meaning of 29 U.S.C. § 203(d);

    c.    Defendants "employed" Plaintiff within the meaning of 29 U.S.C. § 203(g);

    d.    Defendants were required to pay Plaintiff at least the federal minimum wage for each hour she worked.

96.    Defendants violated the FLSA's minimum-wage provision, 29 U.S.C. § 206(a), by failing to pay Plaintiff at least minimum wage for every hour of work in each workweek, to Plaintiff's harm, and are liable to Plaintiff in damages.

97.    Defendants violated the FLSA's overtime provision, 29 U.S.C. § 207(a), by failing to pay Plaintiff for all hours worked. Plaintiff worked 70-100 hours per week.  Defendants' failure to pay for all hours worked violated the FLSA and harmed Plaintiff.  Defendants are liable to Plaintiff for damages.

98.    As a consequence of Defendants' violations of the FLSA, Plaintiff is entitled to recover her unpaid minimum and overtime wages, plus an additional equal amount in liquidated damages, the costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

99.    Defendants' violations of the FLSA were "willful" within the meaning of 29 U.S.C. § 255(a), in that Defendants made no effort whatsoever to pay the Plaintiff the proper overtime wages notwithstanding the fact that she was plainly and obviously working more than 40 hours a week.

## COUNT IV

**Failure to Pay Wages in Violation of Virginia Wage Laws, VA Code Ann. §§ 40.1-28.8 et seq., 40.1-29 et seq.**

100.    Plaintiff reincorporates the allegations contained in paragraphs 1 through 99 as though fully set out herein.

101.    The Virginia Wage Payment Act ("VWPA"), VA Code Ann. § 40.1-29, the Virginia Minium Wage Act ("VMWA"), VA Code Ann. § 40.1-28.8 et seq., and the Virginia Overtime Wage Act ("VOWA"), VA Code Ann. § 40.1-29.3, require Defendants to timely pay minimum wage and overtime wages to Plaintiff for all hours worked, including overtime at, at least, time-and-one-half an employee's regular rate.

102.    Defendants knowingly and intentionally withheld and failed to timely pay Plaintiff for all earned wages (including minimum wage and overtime) due for work performed within Virginia and for the primary benefit of Defendants.

103.    Defendants' knowing and intentional failure to timely pay Plaintiff all earned wages due for employment work duties performed for Defendants' primary benefit each pay period was done with actual knowledge of illegality and was therefore willful and intentional, was not the result of any bona fide dispute between Plaintiff and Defendants and was not in good faith.

104.    Plaintiff is entitled to payment of all earned wages and unpaid overtime wages at time-and-one-half an employee's regular rate, plus treble damages, pre-judgment and post-judgment interest at 8%, and attorneys' fees and costs.

## COUNT V

**Breach of Contract**

105.    Plaintiff reincorporates the allegations contained in paragraphs 1 through 104 as though fully set out herein.

106.    Defendants offered, and Plaintiff accepted, a contract for employment in the United States at a wage rate of $11.00 per hour, and a rate of $14.25 per hour for every overtime hour worked.

107.    The wage rate was a material term of the contract.

108.    Plaintiff advanced consideration for the promises set out in the employment contract in that she left her family in Indonesia and traveled to the United States.

109.    Defendants breached this contract in that, *inter alia*, they did not compensate Plaintiff at a wage rate of $11.00 per hour for each hour worked, and Defendants did not pay Plaintiff any overtime.

110.    In addition to her wages, Defendants recklessly breached other provisions of the Agreement, including but not limited to:

   a.   Providing Plaintiff with seven days of sick leave, 14 days of paid vacation, and two paid holidays for the calendar year;

   b.   Providing a receipt and pay slip for each payment made to Plaintiff; and

   c.   Accessing Plaintiff's bank account.

111.    Plaintiff suffered and continues to suffer economic damages due to Defendants' breach.

112.    Such damages were foreseeable as a result of a breach at the time the parties entered into the employment contract.

## <u>COUNT VI</u>

**Unjust Enrichment Under Virginia Common Law (*in the alternative to breach of contract*)**

113.    Plaintiff reincorporates the allegations contained in paragraphs 1 through 112 as though fully set out herein.

114.    Plaintiff conferred a benefit upon Defendants by laboring between 70 to 100 hours, and sometimes more, per week.

115.    Defendants knew that Plaintiff conferred these benefits to Defendants.

116.    Defendants accepted the benefits (namely, the value of Plaintiff's labor) under circumstances that render it inequitable for Defendants to retain the benefits without paying for its value.

117.    Defendants did not pay Plaintiff the amounts promised to Plaintiff or required by law.  Defendants, therefore, have been unjustly enriched.

118.    Plaintiff is therefore entitled to an award of compensatory damages and/or equitable relief including without limitation imposition of a quasi-contract, restitution, disgorgement or the imposition of a constructive trust upon the monies derived by the Defendants by means of the above-described actions.

## COUNT VII

**Quantum Meruit Under Virginia Common Law (*in the alternative to breach of contract*)**

119.    Plaintiff reincorporates the allegations contained in paragraphs 1 through 118 as though fully set out herein.

120.    Plaintiff provided the aforesaid requested and valuable services to Defendants.

121.    Defendants knowingly and voluntarily accepted Plaintiff's work, 70 to 100 hours per week and sometimes more, which was of material benefit to Defendants.

122.    Much of the work requested and provided exceeded the scope of any contract that may have been in existence, as the G-5 Employment Agreement only covered childcare, housework, and cooking, but Plaintiff was required to perform services other than childcare, housework, and cooking.

23

123.    Defendants did not pay Plaintiff fair value for the work performed, paying only sporadic and inconsistent amounts during the period of Plaintiff's employment.

124.    Plaintiff has been injured and damaged as a result of Defendants' failure to fully and fairly compensate Plaintiff for the above-mentioned services.

125.    It is inequitable for Defendants to retain the benefits of Plaintiff's services without fully compensating them for the value of their services.

126.    As a result, Plaintiff is entitled to the reasonable value of services performed for which they have not been compensated.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.      Under Count I, a declaration that the Defendants' actions as set forth herein willfully violated the TVPA under 18 U.S.C. § 1589;

B.      Under Count I and pursuant to 18 U.S.C. §§ 1589 and 1595 an award to Plaintiff, jointly and severally against each Defendant of compensatory damages, punitive damages, attorneys' fees, and costs;

C.      Under Count II, a declaration that the Defendants' actions as set forth herein willfully violated the TVPA under 18 U.S.C. § 1590;

D.      Under Count II and pursuant to 18 U.S.C. §§ 1590 and 1595 an award to Plaintiff, jointly and severally against each Defendant of compensatory damages, punitive damages, attorneys' fees, and costs;

E.      Under Count III, a declaration that the Defendants' actions as set forth herein willfully violated the minimum wage and overtime provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 206 and 207, such that a three-year statute of limitations is appropriate;

24

F.    Under Count III, an award of Plaintiff's actual damages under the FLSA, pursuant to 29 U.S.C. §§ 206 and 207 in the amount of all unpaid minimum wages and overtime, jointly and severally against both Defendants;

G.    Under Count III, an additional equal amount to Plaintiff as liquidated damages, pursuant to 29 U.S.C. § 216(b), jointly and severally against both Defendants;

H.    Under Counts I and II, an order permanently enjoining each Defendant from further violations of the TVPA;

I.    Under Count IV, an award to Plaintiff of all earned wages and unpaid overtime wages at time-and-one-half an employee's regular rate, plus treble damages, pre-judgment and post-judgment interest at 8% due for violation of the Virginia Wage Acts;

J.    Under Counts I-IV, an award of Plaintiff's costs and reasonable attorneys' fees, as appropriate under the Fair Labor Standards Act, 29 U.S.C. § 216(b), and the Trafficking Victims Protection Act, 18 U.S.C. § 1595, jointly and severally against both Defendants;

K.    Under Count V an award of Plaintiff's unpaid promised wages, in an amount appropriate to the proof at trial, against Defendants plus statutorily authorized interest payments from the date of failure to pay the wages, to the extent that such relief would not reduce the amount otherwise owed to Plaintiff;

L.    Under Count VI, in the alternative to Count V, an award equal to the amount Defendants were unjustly enriched, in an amount appropriate to the proof at trial, against Defendants, plus statutorily authorized interest payments from the date of failure to pay the wages, to the extent that such relief would not reduce the amount otherwise owed to Plaintiff;

M.    Under Count VII, in the alternative to Count V, an award to Plaintiff of the reasonable value of the services Plaintiff performed to Defendants for which Defendants have

not yet compensated them, against both Defendants jointly and severally, plus statutorily authorized interest payments from the date of failure to pay the wages, to the extent that such relief would not reduce the amount otherwise owed to Plaintiff;

N.    Under all counts, pre-judgment and post-judgment interest as permitted by law; and

O.    Such other and further relief as this Court deems necessary and proper.

## **DEMAND FOR A JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial on all issues so triable.

DATED:  April 4, 2025

*/s/ Andrew Bagley*
Andrew Bagley (Bar No. 91927)
Edward North (*pro hac vice forthcoming*)
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
Fax: (202) 628-5116
ABagley@crowell.com
TNorth@crowell.com

*Attorneys for Plaintiff*